# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Brittney Quick,

     Plaintiff,                  :     Case No. 2:18-cv-1547

     v.                           Judge Sarah D. Morrison
                                :     Chief Magistrate Judge Elizabeth P. Deavers

Mayor Jeff Hall, *et al.*

     Defendants.

## OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment. (ECF No. 18.) Plaintiff filed a Memorandum Contra (ECF No. 24), and Defendants filed a Reply (ECF No. 29). The Court construes aspects of Defendants' Reply as a Motion to Strike and treats it accordingly. Also before the Court are Plaintiff's Motion to Dismiss (ECF No. 25) and Motion to Strike (ECF No. 26). Defendants filed a Brief Opposing Plaintiff's Motion to Strike (ECF No. 28), and Plaintiff filed a Reply (ECF No. 30). These matters are now ripe for decision.

## I.    FACTUAL BACKGROUND

Many of the facts are heavily in dispute. Because this is a motion for summary judgment by the defendants, all disputed facts are construed in the light most favorable to the plaintiff. *Davenport v. Causey*, 521 F.3d 544, 546 (6th Cir. 2008). However, where important, disputed facts are discussed from all relevant perspectives.

In July 2017, Plaintiff Brittney Quick returned to her home in Newark, Ohio, from a night out; she "had a buzz" but was not drunk and got into a dispute with her then-boyfriend, Mark Craig. (Brittney Quick Dep. 62:16–63:3, 69:17–70:5, ECF No. 18-3.) Mr. Craig called the

Newark Police Department, and Officer Joseph Phillips[1] responded to the scene. (*Id.* 63:2–3; Joseph Phillips Dep. 18:5–18, ECF No. 18-4.) Mr. Craig told Officer Phillips that Ms. Quick had been chasing him with scissors, which she denied. (B. Quick Dep. 64:12–17.) Based on Mr. Craig's allegation and on Ms. Quick's alcohol intake, Officer Phillips forced Ms. Quick to go to the hospital over her objections. (*Id.* 63:20–64:6, 73:14–21.) Ms. Quick was held overnight in the emergency room against her will. (*Id.* 74:5–14.)

Three months later, Ms. Quick spent an evening with friends and drank three shots of tequila. (*Id.* 34:18–35:8, 79:6–12, 97:20–24.) Ms. Quick had a friend drive her home that night, recognizing that she was "drunk a little at least" and that it was prudent not to drive. (*Id.* 80:11–24.) When Ms. Quick returned home at approximately 2am, Mr. Craig was there, either in the house or waiting outside. (*Id.* 83:13–20, 86:3–9; Mark Craig Dep. 7:15–22, ECF No. 18-7.)

Upon entering the house, Ms. Quick completely undressed in preparation for bed and began to prepare a snack. (B. Quick Dep. 84:22–85:6, 96:17–97:10.) While preparing her snack, Ms. Quick and Mr. Craig got into an argument. (*Id.* 85:8–19.) During the course of this argument, Mr. Craig called Ms. Quick's father, Charles Quick, and told him that Ms. Quick had threatened to take "all her pills." (Charles Quick Dep. 6:8–17, ECF No. 18-8.) Ms. Quick recalls speaking with her father during this phone call but does not have a firm recollection of the conversation. (B. Quick Dep. 102:7–104:11.) However, Ms. Quick denies taking or handling any medication before going to bed. (*Id.* 87:18–24.) After this phone conversation, Ms. Quick went

---

[1] In her deposition testimony and in her affidavit, Ms. Quick has mixed up the two police officers who were at her house in October 2017, Officers Joseph Phillips and Carson Slee. The actions that she attributes to Officer Slee include actions that were indisputably performed by Officer Phillips. For example, Ms. Quick identified Officer Slee as the officer who responded to the July 2017 call, but it was Officer Phillips. In addition, Ms. Quick identified Officer Slee as the officer who drove her to the police station, (Brittney Quick Aff. ¶ 15, ECF No. 22-1), but her summary judgment response acknowledges that it was Officer Phillips, (ECF No. 24, at 4). The Court thus construes all of Ms. Quick's references to Officer Slee in her deposition and in her affidavit to be references to Officer Phillips and vice versa.

to sleep in the nude. (*Id.* 105:1–3.) Mr. Quick was concerned by this call and, at approximately 2:25 a.m., he called the police and told them about his concerns. (C. Quick Dep. 10:19–23; ECF No. 18-2, at 4.)

At approximately 2:35 a.m., Officer Phillips arrived at Ms. Quick's home. (ECF No. 18-2, at 3; Phillips Dep. 16:24–17:1.) Mr. Craig told Officer Phillips that Ms. Quick was threatening to kill herself by taking pills. (Phillips Dep. 16:18–17:4.) Officer Slee arrived at the scene while Officer Phillips was talking to Mr. Craig. (*Id.* 27:10–18; Carson Slee Dep. 11:19–22, ECF No. 18-9.) Officers Phillips and Slee (the "Officers") then went inside the house. (*Id.* 12:3–4.)

Officer Phillips verbally tried to awaken Ms. Quick, but she did not respond. (Phillips Dep. 28:24–29:4.) Then he shook her shoulder, but she still did not respond. (*Id.* 29:20–30:3.) At approximately 2:41 a.m., Officer Phillips called for medical assistance and continued to try to awaken Ms. Quick. (*Id.* 29:4–11, 30:9–12, 30:21–24.)

Ms. Quick, while half-asleep and with her eyes still closed, thought she might have been dreaming and began to engage with the Officers. (B. Quick Dep. 110:19–111:7.) She did not open her eyes until Officer Phillips grabbed her arm and began to shake her. (*Id.* 111:11–112:12.) Upon opening her eyes, she remained unsure what was going on and wondered whether she might have been dreaming. (*Id.* 106:5–11.) However, she recognized that there were uniformed police officers standing over her, and, in particular, she remembered Officer Phillips from her encounter with him three months prior. (*Id.* 105:10–15, 106:19–107:12.) Ms. Quick then began to roll around, and her bedcovers fell aside, revealing her naked body. (*Id.* 111:11–15, 112:20–23.)

At this point, the parties' stories radically diverge. The Officers say that Ms. Quick stood up on the bed, stepped onto the floor, and tried to punch Officer Phillips in the face. (Phillips

Dep. 33:4–34:4; Slee Dep. 13:24–14:7; ECF No. 18-1, at 6:40–8:06.) Officer Slee testified that

he and Officer Phillips grabbed Ms. Quick's arms and that she then began to kick them. (Slee

Dep. 14:7–15; ECF No. 18-1, at 8:06–9:23.) Officer Phillips testified that he decided to take Ms.

Quick into custody after she "started being combative" in response to his questions. (ECF No.

18-1, at 10:10–10:22.)

Ms. Quick does not recall standing up on the bed but acknowledges that it is possible. (B.

Quick Dep. 113:12–24.) She denies stepping towards Officer Phillips, taking a swing at him,

kicking the Officers, or being told to stop kicking them. (*Id.* at 114:1–115:14, 116:8–12.) She

acknowledges that she probably swore at them. (*Id.* 125:9–16.)

The Officers flipped Ms. Quick onto her stomach and put their knees in her back. (*Id.* at

111:11–20, 112:24–113:8.) She cried and screamed at them to get off of her, told them that she

had not done anything wrong, and demanded that they go away and call her lawyer. (*Id.* 113:4–6,

116:16–23.) The Officers held Ms. Quick down, handcuffed her hands behind her back, and

dragged her outside of the house while she was naked. (*Id.* 117:2–19, 118:22–119:4, 121:22–24.)

Ms. Quick does not recall fighting with the police after she was handcuffed. (*Id.* 126:24–127:2.)

Officer Phillips says that shortly after Ms. Quick was handcuffed, medical personnel

came into the bedroom. (Phillips Dep. 38:9–11.) The medics arrived at approximately 2:47 a.m.

(*Id.* 30:9–12.) Both medics testified that when they went inside the house Ms. Quick was

handcuffed and naked. (Austin Von Dach Dep. 8:6–11, ECF No. 18-5; Andy Neuens Dep. 8:19–

24, 9:6–13, ECF No. 18-6.) One of the medics did not recall how long she remained naked or

whether her handcuffs were removed, but he testified that "we" attempted to clothe Ms. Quick

before taking her outside to the medical truck. (Von Dach Dep. 8:19–9:5.) The second medic,

Andy Neuens, thought that Mr. Craig had clothed Ms. Quick after the medics had done a

preliminary assessment but before Ms. Quick was taken outside. (Neuens Dep. 9:17–10: 12, 19: 5–22.) Mr. Neuens does not recall whether Ms. Quick's handcuffs were removed. (*Id.* 9:22–23.)

According to Officer Phillips, efforts were made to clothe Ms. Quick before she was taken outside, but he could not recall whether these efforts were successful. (Phillips Dep. 39:17–22.) Officer Phillips testified that because he did not want to remove Ms. Quick's handcuffs, she was only covered with a robe or blanket. (*Id.* 40:5–21.) He does not recall removing her handcuffs. (*Id.* 49:7–18.) Officer Slee does not recall how or when Ms. Quick became clothed. (Slee Dep. 17:4–9.)

Mr. Craig testified that he found Ms. Quick a robe, the police took off her handcuffs, he put the robe on Ms. Quick, tied it in a knot, the police put her handcuffs back on, and they took her out to the ambulance. (Craig Dep. 17:19–20:4, 46:14–15.)

Ms. Quick claims that she was not attended to by the medics until she was taken outside of the house. (B. Quick Dep. 120:4–11, 123:12-124:3.) She says that she was taken out of the house to the medical truck with a spotlight shining on her. (*Id.* 122:1–4, 127:3–128:7.) Ms. Quick testified that "they might have put a robe over my handcuffed body" but was adamant that she had nothing covering her as she was being taken outside and that nobody asked her about getting her clothes until she got out of the ambulance. (*Id.* 126:10–11, 128:19–129:2, 130:12–21; ECF No. 18-1, at 18:55–19:05, 23:24–23:36.) Ms. Quick did not request that anyone clothe or cover her because she was crying so hard that she could not talk and was struggling to breathe. (B. Quick Dep. 124:20–125:8.)

While these events were transpiring, Mr. Quick spoke on the phone with Mr. Craig, who described to Mr. Quick what was happening. (C. Quick Dep. 12:5–13:4.) Mr. Craig told Mr. Quick that the police had arrived and that Ms. Quick was naked and was "fighting with" the police. (*Id.*

12:21–24.) A short while later, Mr. Craig reported that "they" had taken Ms. Quick out of the house and she was being examined by the medics. (*Id.* 14:24–15:10.) Mr. Craig said that she was still naked, and Mr. Quick told him to get her some clothes. (*Id.* 15:16–20.) Mr. Craig responded that he was trying to give some clothes to the police but that they were ignoring him. (*Id.* 16:6–17:4.) Mr. Craig then said that he could not go outside because he had to write out a witness statement. (*Id.* 17:4–7.) Mr. Quick told Mr. Craig to be sure to give Ms. Quick's clothes to the medics if the police would not take them. (*Id.* 17:8–12.)

After leaving the ambulance and before being placed in the police car, Ms. Quick went into the house to get dressed, although "[e]veryone" was present while she dressed. (B. Quick Dep. 131:23–132:23.) She thinks that her handcuffs were removed and that Mr. Craig helped her get dressed. (*Id.* 132:2–133:11.) Ms. Quick does not know who decided what she was going to wear but she put on a shirt and a pair of sweatpants; she was not wearing shoes, socks, underwear, or a bra. (*Id.* 132:5–9, 134:2–12.)

Officer Phillips then put a handcuffed Ms. Quick into his police vehicle. (Phillips Dep. 49:4–6.) Ms. Quick claims that he tossed her into the police car head first, that her head hit the floorboard, and that she remained on the floor for the duration of the ride to the police station. (B. Quick Dep. 134:13–135:2.) Officer Phillips could not recall how Ms. Quick was placed into the vehicle but denies that she "would . . . have been" put in the car head first with her head on the floor. (Phillips Dep. 49:19–50:18.) Officer Phillips took Ms. Quick to the police station at approximately 3:18 a.m. (ECF No. 18-2, at 4.)

When Mr. Quick went to bail his daughter out of jail, he brought her some clothes. (C. Quick Dep. 19:14–24.) When she came out of the jail, she was wearing jeans and a shirt and had a bag containing the clothes that he had brought her. (*Id.* 22:6–20.)

Ms. Quick contends that at some point she told the Officers that her handcuffs were too tight and that they were injuring her. (B. Quick Aff. ¶ 11.) After the incident, Ms. Quick's wrists showed red marks from the handcuffs. (*Id.* ¶ 18.) She could not feel her right hand for two months, and as of July 2019, she was continuing to receive treatment and was beginning physical therapy. (B. Quick Dep. 160:16–19, 162:1–6.) Since the incident, Ms. Quick has had anxiety and panic attacks, and she was not able to sleep in her bedroom for a period of time. (*Id.* 168:13–22.) She was diagnosed with post-traumatic stress disorder. (*Id.* 168:22–169:1.)

Ms. Quick was charged with two crimes. (B. Quick Dep. 153:20–154:1.) After a December 2017 bench trial, Ms. Quick was acquitted on both charges. (B. Quick Aff. ¶ 4; ECF No. 18-1, at 26:40–42.)

Ms. Quick subsequently filed this Complaint and asserted claims against each of four Defendants: Jeff Hall, the mayor of Newark, Ohio; Barry Connell, the Newark Chief of Police; and Officers Slee and Phillips. Ms. Quick's claims are as follows: Claim 1(a) – false arrest, in violation of § 1983; Claim 1(b) – excessive force, in violation of § 1983; Claim 1(c) – invasion of right to privacy, in violation of § 1983; Claim 1(d) – inadequate medical treatment and care, in violation of § 1983; Claim 1(e) – due process violation, in violation of § 1983; Claim 2 – failure to protect and intervene; Claim 3 – a conspiracy to violate civil rights, in violation of § 1985; Claim 5[2] –a conspiracy to violate civil rights, in violation of § 1983; Claim 6 – assault and battery; and Claim 7 – intentional infliction of emotional distress ("IIED") and/or negligent infliction of emotional distress ("NIED").

---

[2] The Complaint contains no "Claim 4," and the fourth, fifth, and sixth claims are misnumbered as claims 5, 6, and 7. The Court uses the numbering in the Complaint for the sake of consistency.

## II.     DISCUSSION

### A.     Motion to Dismiss

After Defendants filed their Motion for Summary Judgment, Ms. Quick moved to dismiss her claims for denial of medical treatment (Claim 1(d)), "common law assault" (which the Court construes as a dismissal of Claim 6), NIED (part of Claim 7), and failure to train.[3] Ms. Quick's Motion to Dismiss is **GRANTED**. Accordingly, Defendants' Motion for Summary Judgment as to Claim 1(d), Claim 6, the NIED component of Claim 7, and any claim on the grounds of failure train is **DENIED** as moot.

### B.     Motions to Strike

#### 1.     Plaintiff's Motion to Strike

A party's assertion that a fact is not subject to genuine dispute must support that assertion to a citation in the record. Fed. R. Civ. P. 56(c)(1). The Court has discretion as to how to treat any assertion of fact that is not properly supported as required by Rule 56(c). *See id.* 56(e). A party may move to strike such unsupported facts. *See, e.g.*, *Mohney v. USA Hockey, Inc.*, 5 F. App'x 450, 454 (6th Cir. 2001). A party may also object to material that is cited to support a fact if that material does not constitute admissible evidence. Fed. R. Civ. P. 56(c)(2).

Ms. Quick has moved to strike various statements in Defendants' Motion for Summary Judgment that she claims are unsupported. First, she moves to strike any reference to the events of July 2017 on the ground that it is not relevant to this case. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Without determining

---

[3] Ms. Quick did not bring a failure to train claim, although Defendants moved for summary judgment on a failure to train theory, contending that the Complaint impliedly relies on such a theory. (Def. Mot. Summ. J., at 18, ECF No. 18.)

whether all aspects of the July 2017 incident are relevant, at least *some* certainly are. For example, the fact that Ms. Quick knew Officer Phillips because of the July 2017 incident is relevant to her state of mind in October 2017 and how she knew that the men in her bedroom were police officers. Accordingly, the motion to strike all references to the July 2017 incident is **DENIED**.

Ms. Quick also requests that the term "psychotic" be stricken from Defendants' description of the July 2017 incident because it is not supported by medical evidence. Defendants' statement that Mr. Craig called the police in July 2017 because Ms. Quick "was experiencing a psychotic episode" is unsupported. (Def. Mot. Summ. J., at 2, ECF No. 18.) The Court finds no evidence in the record that this was the reason for Mr. Craig's call to the police in July 2017. The motion to strike the term "psychotic" is **GRANTED**.

Ms. Quick next requests that Defendants' reference to her being "highly intoxicated" in October 2017 should be stricken. This motion is **DENIED**. Defendants' summary judgment motion claims: "Quick[] acknowledg[ed] that she was highly intoxicated during the entire encounter . . . ." (*Id.* at 5.) In support, Defendants cite to a line in Ms. Quick's deposition where she says nothing about her level of intoxication. Whether or not Ms. Quick was *actually* "highly intoxicated," Defendants distort Ms. Quick's testimony by saying that she "acknowledg[ed]" that she was highly intoxicated. She did not. At various times, she testified that she had had three shots of tequila, that she was "drunk a little at least," that she told the officers that she was intoxicated, and that she was "a little bit intoxicated." (B. Quick Dep. 80:17–24, 120:19–21, 122:10–11.) The Court is able to review the testimony and recognize when a party's argument is not reflective of the testimony.

Ms. Quick also requests that Defendants' statements that her "drunken recollections are cloudy" be stricken. Yet Ms. Quick acknowledged during her deposition that she was "drunk a little at least." And while she maintained that she is confident that she has a clear and specific recollection of the events on the night in question, (*Id.* 114:8–11), her recollection belied this at times, (*see, e.g.*, *id.* 103:22–104:11, 133:11–134:1). This aspect of the motion to strike is **DENIED**.

Ms. Quick next moves to strike Defendants' reliance on Mark Craig's opinion that Officers Phillips and Slee did not use excessive force. This aspect of the motion to strike is **GRANTED**. A determination of "excessive force" is a factual determination to be made by the jury. Mr. Craig's lay opinion as a fact witness as to whether the Officers used excessive force is not admissible and cannot be used to support a motion for summary judgment.

Finally, Ms. Quick moves to strike Defendants' statement that she was "stumbling around." In support of this statement, Defendants cite Ms. Quick's deposition; however, Ms. Quick did not testify that she was "stumbling around." Defendants cite no other evidence that Ms. Quick was "stumbling," and it is not a fair inference to conclude that, because she had three shots of tequila, she must have been stumbling around. This aspect of the motion to strike is **GRANTED**.

### 2. Defendants' Motion to Strike

The sham affidavit doctrine provides another potential basis for a motion to strike. In response to a summary judgment motion, an affidavit that "directly contradicts prior sworn testimony[] should be stricken 'unless the party opposing summary judgment provides a persuasive justification for the contradiction.'" *France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016) (quoting *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006)). "If the

affidavit does not directly contradict prior sworn testimony, it should be stricken if it is 'an attempt to create a sham fact issue.'" *Id.* (quoting *Aerel*, 448 F.3d at 908–09).

Relying on the sham affidavit doctrine, Defendants argue that Ms. Quick's affidavit should be stricken in its entirety. (Def. Reply to Mot. Summ. J., at 3, ECF No. 29.) The Court has reviewed Ms. Quick's affidavit and compared it to her deposition. The Court has specifically scrutinized the purported contradictions identified by Defendants. Out of the twenty-two paragraphs in her affidavit, sixteen of them (paragraphs 1–8, 12–14, 17, and 19–22) cover the same ground as Ms. Quick's deposition and are entirely consistent with it.

Three paragraphs—paragraphs 11, 16, and 18—consist of information that was not discussed in her deposition. They cover ground that Ms. Quick was not asked about in her deposition, they contradict nothing in her deposition, and they provide information that is consistent with other uncontradicted facts in the record. The Court will not strike these paragraphs merely because they raise new issues. Defendants had the opportunity to address this information during the deposition and failed to do so. That is not a basis for a motion to strike and is not evidence of a sham affidavit.

With regard to paragraph 11 specifically, Ms. Quick avers that she told the Officers that her handcuffs were too tight. (B. Quick Aff. ¶ 11.) Defendants dispute this by pointing to her testimony at her deposition that she never told the medics or anyone at the jail that she needed medical attention for her handcuffs being too tight. (ECF No. 29, at 7.) However, Ms. Quick was not asked during her deposition if she told the Officers that her handcuffs were too tight. Defendants had the opportunity to ask this question. They did not. What remains is Ms. Quick's uncontradicted statement that she told the Officers that her handcuffs were too tight.

Accordingly, this is not an attempt to create a sham fact issue but rather the introduction of relevant information into the record that Defendants did not elicit during Ms. Quick's deposition.

Defendants also argue that paragraph 15 contradicts Ms. Quick's deposition testimony, alleging inconsistencies *within* the deposition. (ECF No. 29, at 6–7.) Except for one small part, paragraph 15 is entirely consistent with Ms. Quick's deposition. (*Compare* B. Quick Aff. ¶ 15, *with* B. Quick Dep. 134:16–135:2.) The only inconsistency is that in her deposition, Ms. Quick testified that "[t]hey" put her in the police car, (B. Quick Dep. 134:16), whereas in her affidavit she said Officer Slee did, (B. Aff. ¶ 15.) As is explained above in footnote one, the Court construes this as a reference to Officer Phillips, not Officer Slee, because it is clear from the record that Ms. Quick has mixed up the two officers. Regardless, this small inconsistency will not be stricken, since Defendants failed to ask for clarification regarding who "they" were that put her in the police car.

That leaves only paragraphs 9 and 10. The Court agrees that parts of paragraphs 9 and 10 are inconsistent with Ms. Quick's deposition testimony. In these paragraphs of her affidavit, Ms. Quick attests that when she opened her eyes, she "saw a strange man on top of" her, she was "[s]cared for [her] life," and she "thought that [she] was being raped or killed." (*Id.* ¶ 9.) She then attests that she did not realize that these men were police officers until they handcuffed her. (*Id.* ¶ 10.) In contrast, at her deposition, Ms. Quick testified that when she opened her eyes, she recognized that uniformed police officers were standing over her. (B. Quick. Dep. 105:10–15.) She also testified that she recognized Officer Phillips from her prior encounter with him. (*Id.* 106:19–107:12.) Parts of paragraphs 9 and 10 directly contradict Ms. Quick's prior sworn testimony, and she has offered no justification for the contradiction. These inconsistent statements are stricken.

The Motion to Strike these inconsistent parts of paragraphs 9 and 10 is **GRANTED**. The Motion is otherwise **DENIED**.

### C.     Motion for Summary Judgment

#### 1.     Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The burden then shifts to the nonmoving party to "'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "summary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

### 2.    Analysis

#### a.    Jeff Hall and Barry Connell

Ms. Quick has sued Defendant Jeff Hall, the mayor of the City of Newark, and Defendant Barry Connell, the Chief of Police. However, both are conspicuously missing from the factual background in this opinion because Ms. Quick has failed to identify in her Complaint, or in her response to Defendants' Motion for Summary Judgment, any basis for liability on the part of either Mayor Hall or Chief Connell. Both defendants are only mentioned in the Complaint in reference to their supervisory roles as mayor and chief of police, respectively. (ECF No. 1 ¶¶ 5, 6, 43, 44, 49.) Neither is mentioned in Ms. Quick's response to Defendants' motion at all. (*See generally* Pl. Resp. to Def. Mot. Summ. J., ECF No. 24.)

Section 1983 does not "incorporate doctrines of vicarious liability," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986), so neither Mayor Hall nor Chief Connell can be liable under § 1983 for the acts of Officers Phillips or Slee. Moreover, the Court has, on Ms. Quick's motion, dismissed any claims based on a failure to train theory. As a result, Mayor Hall's and Chief Connell's motions for summary judgment are **GRANTED** in their entirety.

#### b.    Qualified Immunity

The Officers raise the defense of qualified immunity to most of Ms. Quick's claims. Accordingly, Ms. Quick bears the burden of proving that the Officers are not entitled to summary judgment. *Davenport*, 521 F.3d at 550. An official is entitled to the defense of qualified immunity so long as he has not violated a "'clearly established statutory or constitutional right[] of which a reasonable person would have known.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). This is a purposefully high bar for a plaintiff. Qualified immunity is intended to "give[] government officials breathing room to make reasonable

but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Accordingly, "it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 340 (1986)).

In order for a right to be "clearly established," while there need not be "a case directly on point[,] . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 741. The right must be dictated by "'controlling authority in the[] jurisdiction at the time of the incident' or [by] 'a consensus of cases of persuasive authority such that a reasonable [official] could not have believed that his actions were lawful.'" *Id.* at 746 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).

Moreover, the "right" at issue must be "so well defined that it is 'clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'" *Id.* at 590 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "This requires a high 'degree of specificity.'" *Id.* (quoting *Mullenix*, 136 S. Ct. at 309). That is, there must exist a precedent where "an offic[ial] acting under similar circumstances . . . was held to have violated" the constitutional provision at issue. *White*, 137 S. Ct. at 552.

The qualified immunity analysis involves a two-step analysis involving a determination whether the facts that the plaintiff has pleaded constitute the violation of a constitutional right and whether said right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). It is in the discretion of the Court to decide the order of these two steps, based on the particular circumstances of the case. *Id.* at 236.

### c.      Claim 1(a) – False Arrest

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005). Probable cause need only exist on some charge, not necessarily all charges on which the plaintiff was arrested. *Atkins v. Twp. of Flint*, 94 F. App'x 342, 348 (6th Cir. 2004). It is typically the case that a jury must answer the question of whether probable cause existed, based on the circumstances, unless there is only one reasonable answer to that question. *Diamond v. Howd*, 288 F.3d 932, 937 (6th Cir. 2002).

It is clearly established that an arrest without probable cause constitutes a Fourth Amendment violation. *Baskin v. Smith*, 50 F. App'x 731, 736 (6th Cir. 2002). But an arresting officer "is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information [he] possessed at the time . . . ." *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008). An evaluation of probable cause requires an examination of all of the events leading up to the arrest viewed from the standpoint of an objectively reasonable officer. *Wesby*, 138 S. Ct. at 586.

Defendants argue that the Officers had probable cause to arrest Ms. Quick for two crimes, disorderly conduct and resisting arrest. (ECF No. 18, at 9.) However, the latter crime requires the existence of the former. An officer cannot, as a matter of law, have probable cause to arrest someone for resisting arrest if the underlying arrest was unlawful. *Osberry v. Slusher*, 750 F. App'x 385, 395 (6th Cir. 2018). Thus, if the Officers were not lawfully able to arrest Ms. Quick for disorderly conduct, they necessarily did not have probable cause to arrest her for resisting arrest.

Under Ohio law, an individual who is voluntarily intoxicated is prohibited from "[e]ngag[ing] in conduct or create[ing] a condition that presents a risk of physical harm to the

offender or another, or to the property of another." Ohio Rev. Code Ann. § 2917.11(B)(2), (E)(2) (West 2020). This type of disorderly conduct is a minor misdemeanor. Ohio law generally prohibits law enforcement from arresting an individual for committing a minor misdemeanor. Ohio Rev. Code Ann. § 2935.26 (West 2020). But there are exceptions to this general prohibition, and Defendants argue that at least one of those exceptions applies here.

The disputed facts make it improper to decide whether any of these exceptions apply, because there is a genuine issue of material fact whether Ms. Quick committed disorderly conduct at all. Defendants insist that the testimony of the Officers and of Mark Craig is evidence that Ms. Quick "was physically combative, successively punching and kicking the officers until she was subdued and handcuffed." (ECF No. 29, at 13.) It is, and this evidence may well carry the day at trial. But there remains the competing evidence of Ms. Quick's testimony, for Ms. Quick has consistently denied punching or kicking the Officers.

Defendants claim, without citation, that "[b]y plaintiff's own admission, she lashed out at the officers during the initial encounter." (*Id.*) The Court can find nothing in the record to support this assertion. Ms. Quick acknowledges rolling around in her bed, yelling and swearing at the Officers, and potentially standing up on the bed. If a jury were to believe Ms. Quick's account, she did not present any risk of physical harm to herself or others, or to the property of another, and the Officers did not have probable cause to arrest her.

This factual dispute must be resolved in Ms. Quick's favor at this stage. That more individuals testified that Ms. Quick tried to punch and kick the Officers (three) than testified that she did not (one) does not erase the existence of a genuinely disputed material fact. The summary judgment standard requires there to be "*no* genuine dispute as to any material fact," Fed. R. Civ. P. 56(a) (emphasis added), not a lopsided dispute as to a material fact.

Nor does it matter that Ms. Quick's evidence in support of a lack of probable cause consists entirely of self-serving statements. "Although perhaps not as strong as some other evidence might be, self-serving statements can create a genuine dispute of material fact to be resolved at trial" so long as those self-serving statements are not "blatantly and demonstrably false . . . ." *Davis v. Gallagher*, No. 19-1241, 2020 WL 962304, at *5 (6th Cir. Feb. 28, 2020). Ms. Quick's statements are not blatantly or demonstrably false. It is the jury's job to weigh this competing evidence, not the Court's.

The Officers' Motion for Summary Judgment on this claim is **DENIED**.

### d.      Claim 1(b) – Excessive Force

Excessive force claims are analyzed under the Fourth Amendment. *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009). "Whether an officer has exerted excessive force during the course of seizure is determined under an 'objective reasonableness' standard." *Id.* at 401 (quoting *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001)).

In her Memorandum Contra, Ms. Quick confines her argument to two potential excessive force claims—that the Officers handcuffed her too tightly (the "handcuffing claim") and that Officer Phillips threw her onto the floor of his car (the "gratuitous force claim"). The Court will separately examine each.

"The Fourth Amendment prohibits unduly tight or excessively forceful handcuffing during the course of a seizure." *Id.* This is a right that has long been clearly established. *See id.* In order to establish a handcuffing claim, the plaintiff must prove that 1) she complained the handcuffs were too tight, 2) the officer ignored those complaints, and 3) she experienced some sort of physical injury resulting from the handcuffing. *Id.* The physical injury requirement can be satisfied by evidence of bruising and skin marks. *Id.* at 403.

Ms. Quick asserted in her affidavit that she told the Officers that the handcuffs were too tight and that they ignored her, and she also testified about the injuries that she suffered as a result of her handcuffs. Defendants offer no evidence to contradict this and offer nothing more than a competing interpretation of the facts. Ms. Quick has put forward sufficient evidence to survive summary judgment on her handcuffing claim.

Turning to the second part of Ms. Quick's claim, "'[g]ratuitous violence' inflicted upon an incapacitated detainee constitutes an excessive use of force, even when the injuries suffered are not substantial." *Id.* at 407. It "'is clearly established that an officer may not use additional gratuitous force once a suspect has been neutralized.'" *Id.* at 408 (quoting *Alkhateeb v. Charter Twp. of Waterford*, 190 F. App'x 443, 452 (6th Cir. 2006)).

Ms. Quick claims that Officer Phillips threw her into the back of his police vehicle head first, that her head hit the floorboard, and that she remained on the floor for the duration of the ride to the police station. That is sufficient evidence to survive summary judgment on this gratuitous force claim. Ms. Quick had already been handcuffed (i.e., neutralized) at that point, and any use of force was entirely unnecessary. *Cf. id.* at 406 (finding that officer pushing incapacitated woman's face into the ground to be excessive force as a matter of law). The Court must construe these facts in the light most favorable to Ms. Quick and allow this claim to proceed.

The Officers' Motion for Summary Judgment on the excessive force claims is **DENIED**.

### e. Claims 1(c) and 1(e) – Invasion of Right to Privacy and Due Process Violation

Ms. Quick asserted a privacy violation and due process violation as separate bases for liability in her Complaint. (ECF No. 1 ¶ 52.) While she has not fully explained the basis for her alleged due process violation, she treats both of these claims in her Memorandum Contra as

relating to her claim of forced nudity. Accordingly, the Court construes the due process violation as being an assertion of a substantive due process violation on the grounds of forced nudity.

Tthe relevant case law pertaining to forced nudity in the context of a law enforcement seizure analyzes such a claim under the Fourth Amendment. *See, e.g.*, *L.A. Cty. v. Rettele*, 550 U.S. 609, 615 (2007) (per curiam); *Hall v. Shipley*, 932 F.2d 1147, 1150 (6th Cir. 1991). Ms. Quick offers no case law indicating that such a claim can be brought under the Due Process Clause. Even assuming that there existed a due process right in this context, it is apparent that such a right is not clearly established and the Officers would be entitled to qualified immunity. Accordingly, the Officers' Motion for Summary Judgment on the due process violation is **GRANTED**.

Regarding the Fourth Amendment claim, there are two cases from which this Court concludes that in the context of a law enforcement seizure, the Fourth Amendment prohibits forced nudity for any longer than is necessary under the circumstances. The first of these two cases is from three decades ago. Police officers forcefully entered a home to execute a search warrant and found the plaintiff to be in a state of undress. *Hall*, 932 F.2d at 1148–49. The search lasted approximately twenty to thirty minutes, and although the length of time during which the plaintiff was nude was disputed, the plaintiff claimed that he was denied the ability to put on any clothes during the search. *Id.* at 1149, 1153. The Sixth Circuit concluded: "[A] reasonable officer in appellant officers' position would have known that requiring an individual to sit naked while exposed to the cold January air would violate such individual's 'clearly established' rights." *Id.* at 1154.

Sixteen years later, the Supreme Court decided a similar case in which police officers forcefully entered a home to execute a search warrant and found the plaintiffs in a state of

undress. *Rettele*, 550 U.S. at 609–10. The Court found that the officers were entitled to force the plaintiffs to stand naked for a few minutes while they secured the premises. *Id.* at 614. However, the officers were not free to force the plaintiffs to remain nude once officer safety had been ensured. *See id.* at 615.

While *Hall* and *Rettele* were decided in the context of a search warrant, that difference is not material for purposes of the constitutional right that they clearly established. Both cases analyzed claims of forced nudity during a law enforcement seizure, and both put beyond debate that the Fourth Amendment prohibits excessively prolonged forced nudity in that context. Indeed, various courts have read both *Hall* and *Rettele* to have clearly established that law enforcement may not force an individual to remain in a state of undress any longer than is necessary under the circumstances. *See, e.g.*, *Chaney v. City of Framingham*, No. 18-10413-MPK, 2019 WL 6496842, at *4–5 (D. Mass. Dec. 3, 2019) (finding that "[t]he Supreme Court has interpreted the Fourth Amendment to include the right to be free from unjustified nudity during an arrest" and that *Hall* had recognized "the right not to be unnecessarily naked"); *Thompson v. City of Detroit*, No. 16-14095, 2018 WL 2020996, at *7 (E.D. Mich. May 1, 2018) (citing *Hall* for proposition that plaintiff had "clearly established right to not be detained naked for an extended period of time"); *Spencer v. District of Columbia*, 168 F. Supp. 3d 114, 120 (D.D.C. 2016) ("*Rettele* thus confirms that police violate the Fourth Amendment when they force a detainee to remain unclothed and exposed for longer than necessary to achieve a legitimate law enforcement purpose."); *Brown v. City of New York*, No. 11 Civ. 1068 (AJN), 2013 WL 491926, at *6–7 (S.D.N.Y. Feb. 8, 2013) (concluding from *Rettele* and two other Supreme Court cases that there exists "a clearly established right not to be detained in the nude for longer than necessary to achieve valid law enforcement purposes"); *Hutchinson v. W. Va. State Police*, 731

F. Supp. 2d 521, 541 (S.D.W.V. 2010) (finding that *Hall* concluded "(1) that an occupant may only be kept naked so long as necessary to secure a room or otherwise ensure officer safety, and (2) that prolonged forced nakedness is a violation of clearly established rights"). This Court agrees that there exists a clearly established right not to be detained by law enforcement in a state of undress any longer than is necessary under the circumstances.

Defendants do not contest the existence of this right or that this right is clearly established. Rather, Defendants argue that Ms. Quick was not forced to be nude for any longer than was reasonable under the circumstances. When considering all of the evidence in the light most favorable to Ms. Quick, the nonmovant, she has produced sufficient evidence to create a genuine issue of material fact.

It is uncontested that Ms. Quick's naked body was exposed shortly after the Officers entered the bedroom and that minutes later, the Officers handcuffed her. Based on the disputed facts, there is room for debate as to whether this handcuffing decision was appropriate. Regardless, once Ms. Quick was handcuffed, she posed no danger to the Officers and her naked body should have been covered. Even if the Officers were concerned about removing the handcuffs, Ms. Quick could have and should have been covered in a way that did not require removal of the handcuffs.

The Officers contend that they ensured that her naked body was covered, and there is some evidence that they did. However, there is also contradictory evidence that they did not. In particular, Ms. Quick testified that she was taken outside of her home without clothes on. Construing the facts in the light most favorable to Ms. Quick would mean she remained naked from the time she was handcuffed (shortly before the medics arrived at 2:47 a.m.) to just before

she was put into the police vehicle (shortly before 3:18 a.m.) and that she was taken out into her front yard while naked.

Defendants seek to cast doubt on Ms. Quick's testimony by pointing out purported contradictions. For example, during her criminal trial, Ms. Quick testified that "they might have put a robe over [her] handcuffed body" while pointing out the difficulty of putting and keeping a robe on a person who is handcuffed. However, the remainder of her trial testimony makes clear that even if a robe was draped over her naked body at some point, it was short-lived because she continued to insist that she was taken outside in the nude.

In addition, according to Mr. Quick's report of his conversation with Mr. Craig, Ms. Quick was naked when she was taken outside. Defendants seek to discard this evidence as inadmissible hearsay. (ECF No. 29, at 10–11.) However, Mr. Quick's testimony as to Mr. Craig's contemporaneous description of events is admissible. *See* Fed. R. Evid. 803(1).

Finally, Defendants' own evidence contributes to this genuine dispute of material fact. Officer Phillips recalled an attempt to clothe Ms. Quick but did not recall whether it was successful. Officer Slee could not recall how or when Ms. Quick was clothed, nor could one of the medics. And while Mr. Craig testified that he tied a robe on Ms. Quick, no one else testified that they saw Ms. Quick wearing a robe.

The Motion for Summary Judgment on the Invasion of Right to Privacy claim is **DENIED**.

### f. Claim 2 – Failure to Protect and Intervene

Ms. Quick alleges a failure to protect or intervene vis-à-vis her allegedly improper arrest, the allegedly excessive force that was used against her, and the alleged violation of her privacy

rights.[4] (ECF No. 1 ¶ 54.) Success on a failure-to-intervene theory requires proof of an underlying constitutional violation. *See Simmons v. Napier*, 626 F. App'x 129, 139 (6th Cir. 2015).

Law enforcement officers have a duty "to intervene to prevent an arrest not supported by probable cause . . . ." *Bunkley v. City of Detroit*, 902 F.3d 552, 566 (6th Cir. 2018). This right was clearly established prior to 2017. *See id.* at 565–66.

"A police officer may be held liable for failure to intervene during the application of excessive force when: '(1) the officer observed or had reason to know that excessive force would be or was being used; and (2) the officer had both the opportunity and the means to prevent the harm from occurring.'" *Goodwin v. City of Painesville*, 781 F.3d 314, 328 (6th Cir. 2015) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). However, "officers cannot be held liable under this theory if they do not have 'a realistic opportunity to intervene and prevent harm.'" *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 640 (6th Cir. 2013) (quoting *Ontha v. Rutherford Cty.*, 222 F. App'x 498, 507 (6th Cir. 2007)).

The Court is unaware of a Sixth Circuit case specifically involving a failure to intervene to prevent a privacy invasion. However, it has long been clearly established in this circuit that "'a law enforcement officer can be liable under § 1983 when by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and fairly, and thereby denies equal protection to persons legitimately exercising rights guaranteed them under state or federal law.'" *Bunkley*, 902 F.3d at 565 (quoting *Smith v. Ross*, 482 F.2d 33, 36–37 (6th Cir. 1973) (per curiam). It is thus clearly established in this circuit that an officer has a duty to intervene with

---

[4] Ms. Quick also alleged a failure to protect or intervene with respect to an alleged denial of medical treatment and/or care. (ECF No. 1 ¶ 54.) However, the Court construes Ms. Quick's dismissal of the denial of medical treatment claim as also encompassing a dismissal of the failure to protect or intervene claim rooted in this same asserted harm.

respect to any constitutional violation when that officer knows of the violation and has an opportunity to prevent harm from occurring. *See Fazica v. Jordan*, 926 F.3d 283, 295 (6th Cir. 2019) ("[A] Defendant may be liable if he observes his colleague's unconstitutional act, has an opportunity to intervene, but fails to do so."); *Bunkley*, 902 F.3d at 565–66.

When viewing the facts in the light most favorable to Ms. Quick and incorporating the discussion above, both Officers were present for her arrest and had reason to know that there was not probable cause to arrest her; Ms. Quick told both Officers that her handcuffs were too tight and both had the opportunity to loosen them; and both Officers were present when Ms. Quick was brought outside in a state of nudity and had the opportunity to clothe her. Accordingly, the improper arrest and privacy violation claims may proceed on a failure to intervene theory, as may the handcuffing claim.

The only failure to intervene claim that may not proceed is based on Ms. Quick's gratuitous force claim. As explained above, there is sufficient evidence for an excessive force claim against Officer Phillips to survive summary judgment on this theory. However, Ms. Quick has presented no evidence that Officer Slee was aware of what was happening. Because there is no evidence that Officer Slee had any reason to know of this alleged excessive force, he cannot be responsible for a failure to intervene.

The Officers' Motion for Summary Judgment on Ms. Quick's claim for failure to intervene is **DENIED**, except Officer Slee's Motion for Summary Judgment for failure to intervene based on the gratuitous force claim is **GRANTED**.

### g.      Claims 3 and 5 – Conspiracy

Under the intracorporate conspiracy doctrine, where "'all of the defendants are members of the same collective entity, there are not two separate "people" to form a conspiracy . . . .'"

*Jackson v. City of Cleveland*, 925 F.3d 793, 817 (6th Cir. 2019) (quoting *Johnson v. Hills &*

*Dales Gen. Hosp.*, 40 F.3d 837, 839–40 (6th Cir. 1994)). This doctrine applies to § 1983 and

§ 1985(3) conspiracy claims. *Id.* at 817–18. Members of the same legal entity who are acting

within the scope of their employment cannot conspire with one another. *Id.* at 819. However,

individuals who are alleged to have acted outside of the scope of their employment are not

considered to be part of the same collective entity, and this doctrine does not apply. *Id.*

Ms. Quick's Complaint does not allege that Officers Phillips or Slee acted outside of the

scope of their employment except with respect to Claim 6. (Compl. ¶ 66.) However, the Court

has now dismissed that claim pursuant to Ms. Quick's motion. In addition, Ms. Quick is suing

the Officers only in their official capacities, (Compl. ¶¶ 7–8), and she presents no evidence that

would indicate that the Officers acted outside of the scope of their employment.

Thus, the Officers' Motion for Summary Judgment on Claims 3 and 5 is **GRANTED**.

### h.        Claim 7 – Intentional Infliction of Emotional Distress

An IIED claim requires proving "'(1) that the actor either intended to cause emotional

distress or knew or should have known that the actions taken would result in serious emotional

distress to the plaintiff, (2) that the actor's conduct was so extreme and outrageous as to go

beyond all possible bounds of decency and was such that it can be considered as utterly

intolerable in a civilized community, (3) that the actor's actions were the proximate cause of the

plaintiff's psychic injury, and (4) that the mental anguish suffered by the plaintiff is serious and

of a nature that no reasonable man could be expected to endure it.'" *Ondo v. City of Cleveland*,

795 F.3d 597, 611–12 (6th Cir. 2015) (quoting *Burkes v. Stidham*, 668 N.E.2d 982, 989 (Ohio

Ct. App. 1995)). The "extreme and outrageous" standard is narrowly defined and is difficult to

meet. *Id.* at 612. The Ohio Supreme Court has described this difficult standard as follows:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 453 N.E.2d 666, 671 (Ohio 1983) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)), *abrogated on other grounds by Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2007).

Construing the facts in the light most favorable to Ms. Quick, she was forced out of her house handcuffed and naked with a spotlight shining on her. The Officers should have known the emotional distress that this would cause, and the emotional distress that Ms. Quick alleges that it did cause was foreseeable.

There is also sufficient evidence in the record for a jury to find that this conduct was extreme and outrageous. Exposing the naked body of a seized person to the public is an unnecessary, unreasonable, and deeply humiliating invasion of privacy. *Luster v. Ledbetter*, 647 F. Supp. 2d 1303, 1310 (M.D. Ala. 2009) (citing *Hope v. Pelzer*, 536 U.S. 730, 745 (2002)). The retelling of Ms. Quick's version of the story to an average member of the community could incite him/her to exclaim, "Outrageous!"

In moving for summary judgment on Ms. Quick's IIED claim, Defendants rely on a highly conclusory analysis, and they cite no cases with analogous facts. (ECF No. 18, at 17 ("The allegations simply do not rise to the level of 'outrageous conduct' resulting in a 'severe and debilitating' injury.").) This is insufficient to justify a ruling in their favor as a matter of law.

Defendants also argue that Ms. Quick has not supported her emotional distress damages with "competent evidence." (ECF No. 29, at 14.) However, emotional injury may be proved without medical support." *Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 485 (6th

Cir. 2005). Depending on the circumstances of the case, a plaintiff's own testimony can constitute sufficient evidence of emotional distress damages. *Id.* Ms. Quick testified at length about her emotional injuries, including her anxiety, panic attacks, and post-traumatic stress disorder diagnosis. (Quick Dep. 168:4–172:17.) This testimony is adequate evidence at this stage to support a claim for emotional distress damages.

Defendants' Motion for Summary Judgment on the IIED claim is **DENIED**.

**3.      Conclusion**

For the reasons stated above, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Claims 1(e), 3, and 5 and **DENIES** the Motion as to Claims 1(a), 1(b), 1(c), and the IIED component of Claim 7. Defendants' Motion for Summary Judgment as to Claim 2 is **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion for Summary Judgment as to Claim 1(d), Claim 6, the NIED component of Claim 7, and any claim on the grounds of failure train is **DENIED** as moot.

**III.      CONCLUSION**

For the reasons set forth above, Plaintiff's Motion to Dismiss is **GRANTED**, Plaintiff's Motion to Strike is **GRANTED IN PART** and **DENIED IN PART**, Defendants' Motion to Strike is **GRANTED IN PART** and **DENIED IN PART**, and Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED**.

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**